IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 13, 2002 Session


STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S
SERVICES v. C.S.M. and L.M.M.

IN RE:  C.M.M.


Appeal from the Juvenile Court for Union County
No. 2615     Darryl W. Edmondson, Judge

FILED MARCH 13, 2002

No. E-2000-02806-COA-R3-JV


In this appeal, C.S.M ("Mother") and L.M.M. ("Father") challenge the termination of their parental rights, claiming there was insufficient proof to establish grounds for termination or that it was in the best interest of their child to terminate the parent-child relationship.  We affirm the decision of the Juvenile Court terminating the parental rights of Mother and Father.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of
the Juvenile Court Affirmed; Case Remanded.**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.


Gail F. Wortley, Knoxville, Tennessee, for the Appellants C.S.M. and L.M.M.


Paul G. Summers, Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

This appeal is from an Order of the Juvenile Court for Union County terminating Mother's and Father's parental rights to their son, C.M.M., now 8 years old. As in most appeals involving termination of parental rights, both the procedural background and the facts are critical. We will, therefore, discuss both in some detail.

This case began in November of 1997, when the child was four years old. A petition for temporary custody was filed by the child's grandmother, alleging the child had spent most of his life with his grandparents. It was further alleged that while Mother and Father (collectively referred to as "Parents") did visit their son on weekends, on their last visit before the filing of the petition they missed a doctor appointment and the child was returned to his grandparents with scabies and bruises. In February of 1998, the Juvenile Court allowed the grandparents to retain physical custody, but placed legal custody with the Department of Children's Services ("DCS"). Due to allegations of sexual abuse which were being investigated, the Juvenile Court ordered Parents to have no contact with the child pending further orders of the court. That same month, a Permanency Plan was developed with the goal of helping Parents become able to care properly for their son. Parents acknowledged in writing the terms of the Plan and that it had been explained to them. The Juvenile Court modified its previous order in April 1998 and permitted Parents to have supervised visits with their son.

The Juvenile Court issued a Temporary Bench Order in December 1998, placing full custody of the child with DCS after concluding that probable cause existed to believe the child was dependent and neglected, and due to the emergency nature of the situation, such action was in the child's best interest. A revised Permanency Plan ("Plan") was developed in January of 1999. The goal of the Plan was to assist Parents with obtaining a suitable home for their son and to develop the skills they needed to care properly for their child. A report was prepared by a clinical psychologist in June 1999. The summary from this report is as follows:

> Summary and recommendations: [C.M.M.], a six year old white male in State custody, his parents and grandparents were evaluated in preparation for a custody determination. [C.M.M.]'s father appears unable to parent him without supervision and it was felt that he might expose [C.M.M.] to his uncle in violation of a Court Order. Only supervised visitation is recommended at present. [C.M.M.]'s mother appears able to parent well enough to take care of [C.M.M.], but she has no acceptable home for [him] and there is a concern that she would allow her husband to expose [C.M.M.] to the uncle, so again, for the present only supervised visits are recommended. If concerns about exposure to the uncle are resolved and it is clear that the mother can assert her authority and not be

overruled by her husband's possibly defective judgment, more extensive, unsupervised visits could be allowed.

[C.M.M.]'s grandmother appears able to care for him and motivated to do so. While her intelligence is limited and the home is marginal in terms of resources and cleanliness, she is family and is interested in having [C.M.M.] and devoting her life to caring for him. I think she could make a permanent commitment to doing this assuming that [C.M.M.] does not later become physically unmanageable, and this is an important issue in placement. Were a permanent foster home or adoptive home available which could provide consistent behavioral programming to manage and improve [C.M.M.]'s behavior and a rich educational environment to maximize his intellectual gains, this might be the best course. Given the realistic possibility that [C.M.M.] will be difficult to place permanently in an ideal foster home, placement with grandmother might be best if in-home counseling to help with behavior management could be provided and help with education and socialization could be arranged.

An Answer and Report of the Guardian ad Litem was filed with the Court. The Guardian ad Litem stated in this report that Parents had failed to comply with the necessary requirements set forth previously by the Court and a petition to terminate parental rights filed by DCS would be forthcoming. The guardian ad litem also maintained visitation should be terminated because Father had allowed C.M.M. to smoke a cigarette and because Parents had failed to protect him from an uncle who allegedly had sexually abused him.

On the same day the Guardian ad Litem's report was filed, DCS filed a Petition to Terminate Parental Rights. In the Petition, DCS alleged that:

1.      Parents had abandoned C.M.M. by willfully failing to support or make reasonable payments toward the support of C.M.M. for four consecutive months preceding the filing of the petition;

2.      C.M.M. was found to be dependent and neglected and was placed into custody of DCS; DCS had made reasonable efforts to prevent removal of C.M.M. but these efforts had failed; DCS had made reasonable efforts to assist Parents in establishing a suitable home for C.M.M., but Parents had not made a reasonable effort to accomplish this objective. DCS further claimed Parents demonstrated such a lack of concern that it appeared unlikely they would be able to provide a suitable home for C.M.M.;

3. C.M.M. had been removed by order of the court for a period of at least six months, the conditions which led to his removal still persisted which would subject C.M.M. to further abuse and neglect and prevent his safe return to Parents; there was little likelihood that the conditions leading to the removal of C.M.M. from the home would be remedied and these conditions had persisted for a period of six months; and continuing the parent-child relationship would greatly diminish the child's chances of early integration into a stable and permanent home;

4. Parents were incompetent to adequately provide care and supervision of C.M.M. because their mental condition was so impaired that they would be unable to assume the care and responsibility for their child in the near future;

5. Parents failed to comply with the terms of the Plan in a substantial manner and to remedy the conditions leading to C.M.M.'s removal; and

6. Termination of the parent-child relationship was in the best interest of the child.

The Petition was amended later to allege that Father had committed severe child abuse by touching C.M.M.'s penis and Mother had committed neglect by her knowing failure to protect C.M.M. from this conduct.

Parents stated in their Answer that their monthly income was derived solely from Social Security Disability benefits and totaled $520.00. Parents stated they did not pay any child support because they were never ordered nor asked to do so. The remaining pertinent allegations contained within the Petition were denied by Parents.

A trial was conducted on October 6, 2000. The first witness was Beth Overbay ("Overbay"), who works for Cherokee Health Systems. Overbay taught three parenting classes of approximately two hours each which Parents attended. Based on this limited contact, Overbay opined that Parents could be good parents and should be given an opportunity to try. Overbay did not review any other information pertaining to Parents, although she did speak with a therapist.

DCS then sought to introduce evidence pertaining to the alleged sexual abuse through Sheilagh Barnett ("Barnett"), who works for DCS. Parents objected to the admissibility of this evidence as well as evidence concerning Parents' background based on lack of trustworthiness and hearsay. The Juvenile Court admitted this evidence over the objection of Parents. The Juvenile Court stated, among other things, that it would have to hear the evidence before it could rule on

whether the evidence was trustworthy.[1] Barnett testified she interviewed C.M.M., and he indicated that both Parents had licked his penis and that his uncle had bitten it. When Barnett interviewed Parents about these allegations, they told different stories but denied any abuse. Barnett further testified that after the allegations of abuse surfaced, she ran a background check on Parents. She discovered records indicating Father had been involved both as a perpetrator (with Father's niece) and a victim (by Father's mother) in sex abuse cases, although no criminal charges had been filed in any of these cases.

The next witness was a DCS caseworker, Melissa Bush ("Bush"). Bush had worked with Parents and C.M.M. for a year and a half. Bush was present when Parents exercised supervised visitation with C.M.M. During these visits, C.M.M. was hard to control and Parents "couldn't handle him at times." Bush testified C.M.M. would want to see Father's tattoos. "He'd talk about getting tattoos and about smoking, he would talk about how his dad would let him smoke and dip. He said that on several [occasions]." During the time Bush knew Parents, she was aware of five different locations where they lived. Parents had trouble maintaining a stable home because they could not afford one. They were evicted from at least one residence. Bush acknowledged Parents loved C.M.M. and were trying to be good parents. According to Bush, the Plan required Parents to maintain stable housing for at least six months, and they failed to do this. Their current residence could be acceptable if some minor changes were made. Bush noted that at one point, Parents were living with the uncle who allegedly abused C.M.M. Neither Parent has been employed since Bush became involved with the family. Their income consists of a disability check and food stamps. While Parents did attend three parenting classes totaling six hours, it was standard for most parents to attend sixty hours worth of such classes. Bush testified C.M.M. has improved "tremendously" since visitation with Parents stopped. While he still has difficulty with school, he is now using a fork and a knife and will sit down instead of "running around the whole time while he is eating." C.M.M. can now tie his shoes and say his ABC's. According to Bush, Parents made no real progress until the Petition to terminate their parental rights was filed.

Ms. Lola Kelly ("Kelly"), a residential case manager with DCS also testified. Kelly worked with Parents and C.M.M. from January through July of 1999. When Kelly was present during supervised visits, C.M.M. was out of control. Father's tattoo "meant the world" to C.M.M. Kelly did not believe Parents were able to control C.M.M., although she believed they do love him.

Roy Kersey, Ph.D. ("Kersey"), a clinical psychologist, testified he prepared psychological evaluations on Parents. Kersey testified Father was mentally retarded. Kersey had concerns about Father's ability to care for C.M.M. According to Kersey, Father's abilities were such that he could not plan and exercise proper judgment in order to care for C.M.M. Father told Kersey he used to drink a half gallon of vodka a day, but he was now abstinent. Kersey expressed "serious

---

[1] On appeal, Parents do not challenge the Juvenile Court's admission of this evidence. Rather, they argue that DCS failed to prove by clear and convincing evidence that Parents "exposed to and failed to protect [C.M.M.] from severe child abuse as defined in TCA Section 37-1-102(21)(c)." We will, therefore, consider this evidence to have been properly admitted.

doubts" about Father's ability to care even for a child with no mental or learning difficulties. His concern was even greater for C.M.M. who had been diagnosed with opposition defiant disorder. The conclusions set forth in Kersey's evaluation of Father are as follows:

1.      Results of the present evaluation indicate that [Father] would not be a fit custodial parent for his son, [C.M.M.] His intellectual limitations leave him capable of little more than self-care. Moreover, [C.M.M.]'s special needs require a parent able to be extremely consistent and watchful in following specific procedures designed to improve [C.M.M.]'s socialization. [Father] is clearly incapable of this.

2.      Given [Father]'s inability to follow specific instructions to keep [C.M.M.] away from the danger of possible sexual abuse, he should not be allowed to visit [C.M.M.] unsupervised. Family members are probably not [the] appropriate supervisors of visits because of their low functional level and inability to follow DCS's specific rules, either. If [C.M.M.] is allowed to visit his father, reliable persons outside the family should supervise closely.

Kersey testified Mother was functioning just above the mentally deficient range. He likewise expressed concern about her ability to raise a child, especially one with opposition defiant disorder. He also was concerned about Father's ability to control and dominate Mother. The conclusions set forth in Kersey's evaluation of Mother are as follows:

1.      [Mother] is not a fit custodial parent for [C.M.M.]. Her abilities and her family situation cannot be expected to improve, either, so a permanent placement outside her home should be a focus for [C.M.M.].

2.      [Mother] is easily led by her husband and has trouble grasping complex situations and exercising good judgment in parenting decisions about [C.M.M.], so any visitation should be supervised.

Mother testified she participated in the Permanency Plan. Mother admitted moving around and living in places that were not suitable for C.M.M., or homes which she was told were not suitable. Mother stated C.M.M. was not a difficult child to manage. For the most part, Mother claimed she could raise C.M.M., and they could take care of their son.

The final witness was Melissa Bush ("Bush"), who read into the record the Child Protective Services intake form. The initial call was placed by C.M.M.'s grandmother, who stated that on two occasions, C.M.M. was bruised when he returned from visits with his parents. The grandmother also claimed Father would be abusive to C.M.M. when Father was drunk. She also

related a story where C.M.M. was discovered in the bathroom allowing a dog to lick his private parts, and when he was confronted about the situation, C.M.M. reportedly acted like nothing was wrong because his Father and uncle did that to him too. During the trial, the grandmother could not "remember" making any of these statements.

After taking the case under advisement, the Juvenile Court issued an Order terminating the parental rights of both Mother and Father. We will paraphrase the Juvenile Court's various findings:

1.  Termination of the parents rights was in the best interest of C.M.M.;

2.  Parents had abandoned C.M.M. by willfully failing to support or make reasonable payments toward the support of C.M.M. for four consecutive months preceding the filing of the petition;

3.  C.M.M. was found to be dependent and neglected, was placed into custody of DCS; that DCS had made reasonable efforts to prevent removal of C.M.M., but these efforts had failed; that DCS had made reasonable efforts to assist Parents in establishing a suitable home for their child, but Parents had not made a reasonable effort to accomplish this objective; and Parents demonstrated such a lack of concern that it appeared unlikely they would be able to provide a suitable home for C.M.M. at an early date;

4.  C.M.M. had been removed by order of the court for a period of at least six months; that the conditions which led to the removal still persisted which would subject C.M.M. to further abuse and neglect and prevent his safe return to Parents; there was little likelihood that the conditions leading to the removal of C.M.M. from the home would be remedied and these conditions had persisted for a period of six months; and continuing the parent-child relationship would greatly diminish C.M.M.'s chances of early integration into a stable and permanent home;

5.  Father was mentally retarded pursuant to testing and Mother was in the border-line range of intelligence as determined by testing; that Parents could not adequately provide for the further care and supervision of C.M.M. because of their mental condition; that Parents' condition was likely to remain and it was unlikely that they would be able to assume the care and responsibility for C.M.M. in the near future;

6.    Despite frequent explanations of the statement of responsibilities set out in the Plan, Parents failed to comply with the terms of the Plan in a substantial manner and to remedy the conditions leading to C.M.M.'s removal; and

7.    Parents allowed C.M.M. to be exposed to and failed to protect him from severe child abuse as defined in Tenn. Code Ann. § 37-1-102(21)(C).

## Discussion

A review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Brooks v. Brooks,* 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo,* without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999).

We first address the issues raised by Parents regarding the Juvenile Court's determination that there was clear and convincing evidence of grounds to terminate their parental rights. It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the trial court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Before the trial court may inquire as to whether termination of parental rights is in the best interests of the child, it must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). A court's findings by clear and convincing evidence that one or more of the statutory grounds for termination have been met and that it is in the best interest of the child to do so satisfy the requirement for a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated. This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App.

1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier,* 905 S.W.2d at 188.

Initiation of termination of parental rights may be based upon a number of statutory grounds set forth in Tenn. Code Ann. § 36-1-113(g). This Court has recognized that the existence of any one of these statutory bases will support a termination of parental rights. See *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). In the present case, therefore, we must affirm the Juvenile Court's judgment terminating Mother's and Father's parental rights if the record contains clear and convincing evidence to support even one of the bases found by the Juvenile Court. *Id.* at 474.

Two of the bases relied upon by the Juvenile Court to terminate the Parents' parental rights are Tenn. Code Ann. § 36-1-113(g)(2) and (3), which provide that termination of parental rights may occur if:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability

would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The Juvenile Court found there was clear and convincing evidence that these statutory grounds (and others) for termination of Parents' parental rights had been met. In making this determination, the Juvenile Court had access to reports from the DCS representatives and the reports of the Guardian ad litem. The Juvenile Court heard the testimony of the DCS representatives, and the psychologist who evaluated Parents and C.M.M., as well as the other witnesses. "Unlike this Court, the [Juvenile Court] observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Based on our review of the entire record, including the facts detailed at length above, we do not believe the Juvenile Court committed any reversible error in its conclusion that clear and convincing evidence existed to terminate Parents' parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3). Parents have not been able to establish and maintain a suitable home for C.M.M. They attended a total of six hours of parenting classes. While no one questions that Parents love their son, the evidence does not preponderate against the Juvenile Court's conclusions that Parents are unable to care properly for C.M.M., that the conditions leading to his removal persisted and were unlikely to be changed, etc. Likewise, the evidence does not preponderate against the Juvenile Court's conclusion that Parents were not in substantial compliance with the terms of the Plan. Because we affirm the termination of Mother's and Father's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii), we pretermit whether any of the other statutory grounds for termination as found by the Juvenile Court were met.

Having affirmed that two of the statutory grounds for termination were proven by clear and convincing evidence, we next address Parents' claim that it was not proven by clear and

convincing evidence that the termination of their parental rights was in the best interest of C.M.M. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). After considering all relevant factors and the entire record, including the testimony of all the witnesses, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence existed that it was in the best interest of C.M.M. to terminate the parental rights of Mother and Father.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellants, C.S.M. and L.M.M. and their surety.

_____
D. MICHAEL SWINEY, JUDGE